The last case on our calendar for argument today is in Re Barclays Bank PLC Securities, Askelson v. Barclays Bank, number 173293. May it please the Court, I'm Joseph Daly on behalf of the Lead Plaintiff Appellant and the certified class. I'm reserving two minutes for rebuttal. Because there's a lot to digest in this Summary Judgment Appeal, Your Honors, I'd like to briefly touch upon three main areas. First, Barclays' affirmative misstatement in its Form 20-F that it held 37.8 billion pounds in credit market positions, when in reality it held 60 billion pounds in credit market positions. Second, the offering material's failure to disclose the specific measurable decline in Barclays' capital ratios over just the last three months, which overstated its capital position while understating Barclays' need for more capital in a deteriorating capital market. And third, the defendant's wholesale failure to meet what is their heavy burden of proving that any Series 5 stock price declines after the offering were unrelated to their misrepresentations. Now, turning to that first issue, on page 53 of the 20-F, Barclays voluntarily told Series 5 purchasers that it had 37.8 billion pounds in credit market positions, which was a key metric at a time of great financial turmoil. This Court said as much in the first Barclays' opinion. It has said that again in the Nomura opinion, that the context of the market matters, and it mattered greatly to our clients who were going to part with $2.5 billion of their monies. It omitted $22 billion in other risky credit market assets, and thus Barclays understated its total exposure to those credit market assets by 40 percent. And I would ask the Court, if it's so inclined, to turn to the record, Clerk's Docket 243 at paragraph 244. There are the real numbers of the missing 22 billion pounds in credit market exposures. Now, having addressed the subject of— What exactly are you referring to? Is it in the material before us in the appendix? It's not in the joint appendix, but it's certainly in the supplemental appendix. Where are you directing us to look? Which of the 17 volumes are you directing us to look at? I believe Clerk's Docket 243. I want to say that's a Rule 56.1 statement, Plaintiff's 56.1, yes. Anyways, this Court has a long storied history of recognizing that when you address the subject of something material, you are required to address it fully and completely. Having addressed the subject of credit market positions under the securities laws— Hang on just a second. I really want to know what document you were talking about. Document 243 is the Plaintiff's Response to Barclays Defendant's Local Rule 56.1 Statement. So that is— Okay. I just happen to have a copy of it here. Oh, good. I don't have a page reference. I'm told it's Volume 1. The page at the bottom—well, actually, the number at the top, the ECF number is page 86 of 161. The number at the bottom is—it's page 83 of our submission, but it is specifically paragraph 244. And you will see there the missing $22 billion in credit market assets. Okay. As I was saying, having addressed that very key subject, that very material subject, Barclays was under duty to fully disclose it, and they didn't. In fact, they went beyond that. On page 53 of that Form 20-F, they specifically pointed to ABS-CDOs, asset-backed securities collateralized debt obligations. They said, we have on our books 6.1 billion pounds of these, but don't worry, investors. None of them are wrapped by monoline insurance, because everybody knew at the time that the monoline insurers were under a lot of pressure. They had hundreds of billions of exposure. What Barclays did not tell the investors was that it had another 6 billion pounds in those very same asset class, ABS-CDOs. And, again, that's at paragraph 244 that I was just speaking to Your Honor about. Didn't the district court say that the reference was none of the above are wrapped by monoline insurers? That's true. And read in context, it was very clear that that wasn't the full statement. Well, two points. The key word, the first point, the key word there is above. So they're specifically pointing investors to those ABS-CDOs above. But while that may be literally true, and, again, this court recognizes that literal truth can still be misleading, while that may have been literally true, at the same time, it omitted a material 6.118 billion in other credit market assets that were wrapped by monoline insurers. And that certainly would have mattered to our clients. I want to just jump very briefly to the fact that the defendant's burden in proving negative loss causation, the district court took that burden and flipped it onto the plaintiffs. The district court took unreliable expert testimony from Barclays' expert, Dr. Clyden, where he decided unilaterally that he was going to use the characteristic of the criterion of statistical significance in order to not look at 107 of 114 days of abnormal price returns. So the district court, you know, accepted the defendant's expert on loss causation. Yes. And held that the defendants had shown that there was nothing suggesting a relationship between the price declines, after corrective disclosures, reflecting the price decline. And so that my question to you is, what do you point to in specific to show that there was a resulting loss? Because I read your argument as basically they haven't shown it, they haven't shown it, we don't like the defendant, that the expert, you know, the fact that there was a decline momentarily that was then recouped, that the defendant's expert says was statistically not significant doesn't mean that it wasn't actually caused, and therefore it still is sufficient. But I still didn't hear a robust rebuttal saying here's the loss that we trace to these overstatements. Thank you, Judge Carney. A couple points in response, and I don't mean to be flippant here, and I don't mean to sound aggressive, but that is not our burden. The burden is on the defendants to point to the absolute loss. But what I'm trying to telegraph to you is that I'm not sure you have raised a significant enough response to what they have offered to suggest that they haven't carried their burden. I'll give you an example. They point to an August 7th disclosure that they said completely took care of any misstatements having to do with monoline insurance and the notion of the $22 billion underlying that. That's simply not true. There was a $0.23 decline on that day, and the expert ---- That was recouped very quickly after, and all of the ---- there was a disaggregated presentation of the coverage of which assets were wrapped by the monoline insurers. All the things that are the focus of your nondisclosure argument seem to have been rectified there. Why is that wrong? Not as a matter of law, because there were a series of disclosures. Our expert, Chad Kaufman, pointed out a series of disclosures in August, October, et cetera. For example, when you say that the notionals were completely disclosed, that's in the defendant's form 6K. That said nothing about the $22 billion in credit market assets that was not disclosed back in March of 08. That said nothing about the fact that the monoline insurers were masking, were hiding the $22 billion in credit market assets. And we ---- I'm still having trouble finding any basis for discounting defendants' offerings on causation based on what happened in the market after corrective disclosures were made. I want to point just to two or three dates. Again, the August 7th disclosure, which they say completely disclosed any problem with the monolines. And I have already made the point that it didn't say a word about the $22 billion in credit market positions. On August 14th, the Series 5 shares declined 1.72 percent after analysts revealed that Barclays might need to record additional billions of pounds in credit market write-downs. Expert Dr. Clyden for them ignores that because he says it's not statistically significant. He doesn't say that it doesn't address the subject of credit market positions. He just says it's not statistically significant, therefore I don't have to look at it. This Court has said in the Ackerman case and again in Nomura that the onus is on the defendants to prove this. Congress deliberately ---- The defendants, let me ask you still about the prices. I mean, after the August 2008 disclosure, so the price fell from what my notes show, fell 23 cents from $24.69 to $24.46, and then one week later the price went up to $24.31, and then two weeks later $24.60, the share price then exceeding the predisclosure price on several of those days. This still isn't, you know, striking me as suggesting that a loss was caused by the omissions and people's reliance on the omissions that you have said were material. So tell me why I'm wrong. Your Honor, first of all, reliance is not an element of our 33 Act claim. But at the time that the complaint with these Series 5 allegations was filed, the price of the Series 5 ADS shares had already dropped to $12 and change, half the price of the offering price. I would point you all the way out until October 2008 when those shares dropped 6.74 percent on ---- October of 2008 was a significantly different setting than August when the corrective disclosures were made. Our law and practice is to look at the effect on the market when the corrective disclosures were made. I understand that. You have more of a causation issue. I understand that, but it's also this Court's position, which again mentioned in the Petrobras case, that whatever is going on in the market at the time, it is the defendant's burden to disaggregate those effects, and they did not. They went so far as to ---- Dr. Clyde went so far as to specify the 114 days when Barclays' share of the Series 5 prices could not be explained by market factors. Right? He took those out of them. We're talking about residual returns, abnormal returns. But he refused to look at 107 of those 114 days. So they simply haven't carried their burden. All right. Thank you very much. We'll hear from Mr. Tomeno. Tomeno, Your Honor. Tomeno, pardon me. Thank you. I think Tomeno is the way they actually pronounce it in Italy, but for some reason my family pronounces it Tomeno.  Very good. We'll go to Tomeno. May it please the Court. I think maybe I'll just pick up where Mr. Daly left off with the Court's permission. A couple of points on loss causation or negative causation, as it's called in the Section 11 context. Your Honor, there is really not a cleaner case of negative causation having been established here than this one. Well, if you're going to go down that route, let me just push back a little bit. I spent a lot of time with Mr. Kaufman's rebuttal report, and I thought it was interesting. I'm not saying I agree with it because econometrics is not my thing, but there are at least some discussions about some sort of foundational, fundamental flaws in the methodology and then the possibility that some of the things that are looked at as expected losses were, in fact, caused by some of the very same conduct that is alleged in the complaint here. And so I guess my point with all of this is Mr. Kaufman's report presents a cogent counterargument to Dr. Clyden's report. How was the district court able to say as a matter of law, in the face of this rebuttal report, that negative causation had been demonstrated? A few points, Your Honor. Thank you. First, Dr. Clyden's event study for the defendants used statistical significance thresholds. One of the principal criticisms that Mr. Kaufman had of Dr. Clyden, and Mr. Daley just alluded to it, was that by using statistical significant thresholds, Dr. Clyden didn't end up looking at a bunch of other days where the stock price moved around. Statistical significant thresholds are standard operating procedure for these kinds of event studies. Vivendi says that. Dr. Clyden used a standard methodology in his event study, and what Mr. Kaufman did was to sort of nitpick around the edges of some of his methodology. Mr. Kaufman did not do his own event study, which is unusual, even in a case where it's the defendant's burden. He did not analyze the causes of any price changes. He did not opine that the three corrective disclosures that Dr. Clyden identified were not, in fact, corrective. He did not opine that any of Dr. Clyden's conclusions on lack of statistical significance were wrong. And he did not identify, to Judge Carney's point, any other disclosures that he opined were corrective, that is to say, revealed some then undisclosed omission, omitted information, or previously misstated information that needed to have been disclosed at the time of this offering. Now, in the Arkansas teacher's case against Goldman Sachs, this Court recently observed that statistically insignificant price movements are indistinguishable from random fluctuations in the market. So although Dr. — Mr. Kaufman, excuse me, pointed out a number of other days where the stock price moved around, he did not identify a single statistically significant price movement on any of those days. And that's very important here because — and the Petrobras case was mentioned and the Nomura case was mentioned. It's important — we grant Mr. Daley that it was our burden and it was important for us to come forward with a showing that disaggregated the post-August price declines or disentangled the post-August price declines from any allegedly misstated or omitted information that was required to be disclosed at the time of the offering. The event study of the kind that Dr. Clyden used provides precisely that disentanglement. And in Nomura, the defendant's expert did not do an event study. It was a different kind of case for other reasons as well. But the disentanglement or the disaggregation was provided not only by Dr. Clyden's event study that incorporated statistical significant thresholds that are standard operating procedures, according to this court in Vivendi, but the actual prices themselves. Leave Dr. Clyden aside. The actual price activities themselves refute causation. On May 15th, the first correction, the price went up. On July — June, excuse me, June 25 of 2008, where the additional capital raise was announced, the price went up. On August 7th, 2008, when a lot of things were disclosed, this was not just a press release that said, oh, by the way, the so-called notional amount of our monolithic insurance is X. And the price went down by a statistically insignificant 23 cents. But leave that aside. As an absolute number, it went down by less than 1%. But that disclosure on August 7th also announced another 1 billion pounds in net losses due to credit market deterioration that indisputably had occurred between the time of this offering and August. Judge Carney, you're quite right that the world in October was totally different than it was in April. Everybody knew what was going on in April. It was a time of serious market dislocation, but things got worse. In September, Lehman failed. In September, October, AIG had to be bailed out. There was a ton of things that happened during this time period that no one is claiming could have been or should have been disclosed back in April of 2008. In the post-August 8th — excuse me, the post-August 7th, 2008, price declines that the plaintiffs are seeking to recover followed all kinds of now famous or infamous financial crisis events that no one claims could have been disclosed by then. The March price, the class period low price of $4.95 that's cited in the complaint here, was the — I think it was the 12-year low for the Dow Jones Industrial Average. So those are the reasons why Dr. Kaufman did not provide an adequate rebuttal to Dr. Clayton. He simply provided speculation. He identified some other news articles. He said Dr. Clayton should have considered them. But he doesn't say why because all of those price movements he's pointing to were statistically insignificant, except for one, which was October 13th, 2008, where Barclays announced a second capital raise after the — the first capital raise post this offering at issue in this case was announced on June 25th, and as I mentioned, the price went up. The next capital raise after that was announced on October 13th, and that gave rise to a statistically significant price movement, which Dr. Clayton looked at, and it was an increase of over 50 percent. Why is that? Because these shares are preference shares. They sit between common equity and debt securities in the capital structure. So raising more equity capital is good news for these shares because it means there's a bigger equity cushion to pay dividends, and in this Court recognized in the Litvak case, different securities holders have different economic interests. And so the statistically significant price change post-August 7th, 2008, the only one, caused a 52 percent increase in the price of the stock. I'd like to move quickly, if I might, Your Honor, just to the alleged two omissions that remain in the case because I see I have two minutes and I think it's important. Now, the loss causation takes care of all of that. One could assume one could assume actionability of those omissions and just affirm Judge Crotty on the ground of negative causation. But I think it's important, and with the Court's permission, I'll just address it briefly. Both of the alleged omissions are clearly inactionable, and Judge Crotty went through an incredibly methodical analysis as to why. Like any omissions case, first the question is, was there a duty to disclose? A duty to disclose could be found in a regulatory provision, a statutory provision, an accounting provision, or a duty to disclose omitted information can arise from the need to disclose additional information in order to render something else that was said not misleading. Judge Crotty went through each of those steps. He determined there was no duty on the notional amount of monoline insurance applying this Court's decision in RBS. He took a position that the Court, that in RBS we were instructing that Barclays had no duty as a matter of law to disclose the notional amount of its monoline-insured assets. Is that how you read RBS? Not quite, Your Honor, and I'm not sure. Well, let me put it this way. In RBS was a motion to dismiss. I actually listened to the argument on Friday because Mr. Daley argued the case. It's the same exact arguments they're making here. And Judge Crotty, I think what he was saying, and I'm very familiar with the sentence you just referred to, Your Honor. I think what Judge Crotty was saying was that in RBS the conclusion was they looked at the allegations of the complaint. The Court assumed, as it had to on a motion to dismiss, that they were true. And accepting those allegations as true, the pleading in RBS didn't give any reason why an exposure to monoline insurers needed to have been disclosed instead as an exposure to the underlying assets. Here, similarly, where there are no disputed issues of fact on this point, we know what the notional amount was. We know what the exposure to monolines was. That was the $1.335 billion that was disclosed. And so I think what Judge Crotty was saying that this Court instructed in RBS that in a situation like that, which is the same here for all intents and purposes, there was no duty to disclose. And the reason there was no duty to disclose is that, and I think it's a stronger case here than in RBS, excuse me, because Barkley's disclosure said what the $1.335 represented. It said this is our exposure to monolines. It explained what that meant. It said the value of exposure to monoline insurers under these contracts was $1.335. Barkley's went further, and I didn't see this in RBS. I didn't handle that case, so I'm not sure about all the details of it. But I didn't see an argument made in RBS like this one, where Barkley's disclosure went on to say that the notional amounts do not indicate Barkley's exposure to credit or price risks. And so we have a case here, Your Honor, where Barkley's explained to investors what it was disclosing, the exposure to monolines. That's really the value of the insurance as of that point in time on a mark-to-market basis that was all explained, but went further and also disclosed what we're not disclosing. Everyone knew that there was a notional amount or that there were underlying assets beneath these insured positions. In fact, there was an earnings call that's in the record, and the page references, Your Honors, are COSA, which is the way they prefix the supplemental appendix, COSA 4572 and COSA 4584. This is the February 19, 08 call with investors. It's a public call announcing the results for the year ended 12-31-07. And in that call, it was also explained that the $1.335 billion of monoline exposure is the mark-to-market value of the monoline insurance as of that 12-31-07 date. And a question was asked, which was, because in the prior reporting period, the exposure to monolines was only $140 million. Now it's up to $1.335 billion. And a question from a securities analyst was asked during that call, does that increase represent even more monoline insurance positions, or does it just represent deterioration in the underlying? And the answer was that it represents the mark-to-market decline in the underlying assets and not a whole lot of new positions. In fact, there were no new positions as the plaintiff's expert admitted at deposition. So everybody knew what they didn't know, if I could put it that way, Your Honor. And in addition, PwC, the auditor, was all over this issue, and plaintiffs subpoenaed the PwC specialists on monoline insurance. We didn't. They did. They took his deposition. He testified that the notional amount in this context is, quote, not a real meaningful number, close quote. That's COSA 4844 in this context. And the reason for that is exactly the argument that was made in RBS. The notional amount of underlying insured assets, that really just means the face value, the par value, is not the exposure to the underlying assets, and it's not the exposure to the monoline insurance. And the investors were told that it was neither of those. And no one at these securities analyst calls asked, what is your notional amount? All right. Thank you very much. Thank you, Your Honor. Mr. Tomeno. Mr. Daley, please. We'll give you a little extra time since I let Mr. Tomeno go over. A couple of quick points, Your Honors. As Judge Fela pointed out, expert Kaufman did do a cogent and compelling job of pointing out the flaws in Dr. Clyde's methodology. And yet, despite that, as a matter of law, the district court decided that that battle of the experts was not going to go before the jury. The judge said that plaintiffs were complaining about perhaps the weight to be attributed to Professor Clyde's analysis. That's a textbook example of a question that goes in front of a jury, not in front of a judge as a matter of law. Second point, there's a lot of talk over the last ten minutes about the deteriorating market. We all know the market was deteriorating, but let's not forget two points. Number one, Barclays was telling everybody back at the time of this offering, which is a very key snapshot in this whole story, they were telling everybody they're above the fray. Their peers were writing down, like UBS, $19 billion in subprime assets. Barclays wasn't doing that. Barclays shares, in fact, went soaring. That's the quote from the analyst, went soaring in March, because they seem to be doing so well compared to their peers. Now, this court in the Nomura case talked about a deteriorating market, and this dovetails with our point about it's not our burden, it's their burden to disentangle the effects. This court in Nomura said, the crucial point that dooms the defendant's loss causation defense is that those macroeconomic forces, the deteriorating market, and the misstatements were intimately intertwined. That is precisely what was happening here. The very same financial shenanigans that Barclays was doing in its form 20-F were what contributed to its later implosion. Did Nomura involve affirmative misrepresentations or omissions, the way your case does? I don't know that. But at the time of this deteriorating market, what mattered, because the market was deteriorating, that is why it mattered so much for honesty four months earlier in April at the time of the offering. Our clients did not know at the time about the $22 billion, I'm sorry, £22 billion, which is more like $44 billion in credit market assets that were not listed there. Our clients did not know that the United Kingdom's Financial Services Authority had come in and said, we're really concerned about your capital ratios. You've got a target of 5.25%. You've told us, or your numbers tell us, you're not going to meet that target for 22 of the next 24 months. And I know the defendants make a point about, well, there was a 2% regulatory minimum, but that doesn't matter. Barclays itself wasn't happy with the 2% regulatory minimum. Barclays itself set a bar of 5.25%. They knew they weren't going to meet it for the next 22 months. They refused to tell our clients about it. And instead, in the Form 20-F, they said, our capital equity ratio is at 5.1%. Well, as of the time of the offering, that was a lie. It had already deteriorated down to 4.34%, and it had done so steadily over the last three months, and that steady decline is a trend under Item 503, I'm sorry, 303. That is a duty to disclose that was violated. Thank you, Your Honors. Thank you very much. I think we have your arguments. We'll take the matter under advisement. That concludes our oral argument calendar for today. We have one matter on submission, or two actually, Consolidated U.S. v. Jorge Gomez and Sandy Gomez, and we will take those on submission, as I said. Thanks very much. If the clerk will please adjourn court. Thank you.